IN THE UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

IN RE:      NEAL EUGENE ROBBINS,               CASE NO.  4:06-bk-11394M
              Debtor                                                                         (CHAPTER 7)

NEAL EUGENE ROBBINS                                                      PLAINTIFF

v.                                                AP. NO. 4:06-AP-01146

EDUCATIONAL CREDIT                                                   DEFENDANT
MANAGEMENT CORPORATION

## MEMORANDUM OPINION

      Neal Eugene Robbins (Debtor) filed an adversary proceeding on May 9, 2006, to determine the dischargeability of his student loans.  The Debtor argues that excepting this claim from discharge pursuant to 11 U.S.C. § 523(a)(8) would impose an undue hardship on him.  A hearing was held on March 23, 2007, in Little Rock, Arkansas.  The Court took the matter under advisement.

      The Court has jurisdiction pursuant to 28 U.S.C. § 1334 and § 157.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(I), and the Court may enter a final judgment in the case. The following shall constitute the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

## FACTS

      The Debtor is a fifty-four year-old unmarried male who has no children and lives in Dover, Arkansas.  He resides with his mother, brother, and nephew.  His father died a few years

1

ago. The Debtor is currently unemployed. He attended Hendrix College and graduated with a Bachelor of Arts in philosophy in 1975. The Debtor attended graduate school at the University of Florida from 1975 to 1977; he did not receive a degree. His field of study was philosophy. From January of 1978 to May of 1979 the Debtor attended the University of Arkansas at Fayetteville where he also failed to receive a degree. His parents paid for all of these educational expenses.

At some point prior to 1982, not shown in the record, the Debtor joined the United States Air Force. In 1982, while the Debtor was in the Air Force he was referred to the Mental Health Clinic for an evaluation. (Plaintiff's Ex. 2.) The report stated the following:

> 1. Identification: SrA Neal E. Robbins is a 29-year-old single Caucasian male with approximately three years of active duty service. He is a Telecommunications Operations Specialist assigned to 1251 CS.
>
> 2. Mental Status Examination: This is a nonpsychotic individual who displayed obvious depressive symptomatology. There was no indication of a neuropsychiatric impairment. He denied suicidal and homicidal ideation, as well as auditory and visual hallucinations. Mild psycho-motor retardation was noted. While slow and hesitant, his speech was coherent.
>
> 3. Psychological testing: Both the MMPI and the Shipley-Hartford were administered. On the Shipley-Hartford he achieved an IQ score placing him in the above-average range of intellectual functioning. MMPI test results present the picture of a severely depressed individual who is experiencing a considerable amount of anxiety. Poor self esteem and schizoidal tendencies were also indicated.
>
> 4. Diagnosis: DSM III, Dysthymic Disorder, 300.40.
>
> 5. Discussion: SrA Robbins was referred to the Mental Health Clinic for an evaluation by 1Lt Barlow. SrA Robbins is not a discipline problem; however, his depression and lack of confidence is quite evident to his co-workers. While not on PRP, he performs duties in a Top Secret/SIOP ESI area. He has been seen at the Mental Health Clinics at Lackland AFB and Tinker AFB. SrA Robbins has been placed on antidepressants and at least, presently, seems to be responding favorably to this medication.

> 6. Recommendations: Removal from his present AFSC is strongly encouraged. SrA Robbins is capable of functioning in a less vital and lower stress duty assignment. Allowing SrA Robbins to reenlist should be seriously questioned.

(Plaintiff's Ex. 2.)  The diagnostic criterion under the DSM III[1] for Dysthymic Disorder is:

> A.  During the past two years the individual has been bothered most or all of the time by symptoms characteristic of the depressive syndrome but that are not of sufficient severity and duration to meet the criteria for a major depressive episode . . . .
> B.  The manifestations of the depressive syndrome may be relatively persistent or separated by periods of normal mood lasting a few days to a few weeks, but no more than a few months at a time.

American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 220 (Press Syndicate of the University of Cambridge, 3d ed. 1985).

The Debtor was apparently discharged from the Air Force at some time not shown by the record.  In November of 1985, the Debtor began receiving disability checks from the Veterans Affairs (V.A.) due to Dysthymic Disorder.  The Debtor was again evaluated in 1986.  The examining physician made the following report:

> The veteran reported a generally unremarkable family history, saying that he felt close to his parents and that he did not recall any significant familial history of mental illness.  However, he did report that he had little contact with his parents at the present time and felt that this was mostly due to the distance between where they live and his home in Little Rock.
>
> MENTAL STATUS EXAMINATION: The veteran was a generally casually groomed individual who had a somewhat sloppy appearance about him.  He avoided all eye contact throughout the examination and spoke in a pronounced monotone, although he did speak readily with me.

---

[1] The DSM-III is no longer used, rather the DSM IV-TR is now consulted when diagnosing mental disorders. The DSM-III is quoted here, however, because it was the manual consulted when these diagnoses were made. It is worth noting that the DSM-IV-TR does not appear to alter the definitions of either diagnosis in any significant way.

>Throughout the examination anxiety was quiet prominent and the predominant mood was one of depression. Some perseveration of speech was noted. There was also a tendency for the veteran to be over-detailed in his speech and quite precise. No signs of inappropriate affect were noted at any time during the examination, although some marked blunting of affect was noted.
>
>The veteran's thought processes and associations were logical and tight and no loosening of associations was noted. There was no sign of any impairment in speech. The veteran was oriented times three. No impairment in memory was observed, nor was any confusion noted. The veteran denied any hallucinations and no delusional material was observed during this examination.
>
>The veteran's insight is somewhat limited and his judgment is adequate.
>
>As noted above, the veteran denied suicidal ideation at present or by history.
>
>COMPETENCY: It is the opinion of this examiner that the veteran is competent for VA purposes and that he was not in need of psychiatric hospitalization at the time of this examination.
>
>PSYCHIATRIC DIAGNOSIS:
>   1. DSM-300.40 Dysthymic disorder
>   2. DSM-301.22 Schizotypal personality disorder

(Plaintiff's Ex. 3.) Schizotypal personality disorder under the DSM-III is defined as the

following:

>The essential feature is a Personality Disorder in which there are various oddities of thought, perception, speech, and behavior that are not severe enough to meet the criteria for Schizophrenia. No single feature is invariably present. The disturbance in the content of thought may include magical thinking, ideas of reference, or paranoid ideation. Perceptual disturbances may include recurrent illusions, depersonalization, or derealization. Often, speech shows marked peculiarities . . . . Frequently, but not invariably, the behavioral manifestations include social isolation and constricted or inappropriate affect that interferes with rapport in face-to-face interaction.
>
>   Associated features. Varying admixtures of anxiety, depression, and other dysphoric moods are common . . . . During periods of extreme stress transient psychotic symptoms may be present . . . .
>
>   Impairment. Usually some interference with social or occupational

functioning occurs.

American Psychiatric Association, <u>Diagnostic and Statistical Manual of Mental Disorders</u> 312 (Press Syndicate of the University of Cambridge, 3d ed. 1985).

The Debtor attended the University of Central Arkansas from the fall of 1983 to March of 1988. He stated that he was majoring in French and attempted to obtain a teaching certificate; he did not receive a degree. His parents also paid for this educational endeavor. Thereafter, the Debtor attended the University of Texas from 1989 to 1992, except for the summer he lived at home in Dover, Arkansas. The Debtor's educational expenses were paid for at the University of Texas with the use of student loans that are the subject of these proceedings. The Debtor received the student loans from Sallie Mae, which assigned the loans to the Educational Credit Management Corporation (ECMC). The Debtor failed to receive a degree from the University of Texas.

The Debtor testified that he has made several attempts to become employed to earn money so that he could pay back the student loans, but all efforts have ended in failure. In May of 1996 the Debtor taught English in Korea, but by December he was terminated because according to the Debtor his superior "was not satisfied with my methods of teaching, that sometimes I talked over the students' heads, that there were some cases I did not get along with a couple of students." In June of 1997 the Debtor went back to Korea to teach at a different institute. The Debtor testified that in August he was terminated because his superiors "were not satisfied with my performance as a teacher." The Debtor taught in Saudi Arabia starting on November 5, 1999. Two months later he was terminated because of "difficulties I had in controlling classes." The Debtor worked at some temporary jobs in Little Rock for one to three

days at a time; he stated that the employers "were not satisfied with my performance."

The Debtor testified that he has a "decent background" in Arabic and Turkish. He speaks some French, but stated that he is pretty "weak on it." He has studied a language called Baluchi, but is "getting rusty on it." He stated that he has also studied an ancient language called Acadion. He sought jobs as a translator for Arabic and Turkish on the internet unsuccessfully. He sought a job with the Federal Bureau of Investigations to no avail. The Debtor holds some type of book-selling license that he acquired in 1998. He has been unable to sell any of the material. These materials include titles such as: Ilat; Najmah's Gifts to Dousares; Sand Beneath the Rainbow; The Star Locusts; Cyborgs and Greens; Lavender Starlight; Creatures of Magellanic Clouds; The Neglected Princess; Kana of the Snow-Capped Mountains; The Crimson Fish; Snow and Caverns; The Enchanted Deer; Harpies and Gorgons; and Rishta and Baal. (Defendant's Ex. 4 and Plaintiff's Ex. 5.)

The Debtor's mother testified the following: [2]

> Well, for so long, my husband and I just did not realize that – because he could achieve academically, we didn't understand that his social condition – which is a social thing from Dysthymia – we didn't realize – and, but, and it has progressed.
> And he talks to himself quite a bit. And he may speak irrationally at times. He has actually tried. We just didn't realize. We paid for him to go through Hendrix and through – at University of Florida and University of Arkansas and UCA, because we kept thinking that surely he would be able to hold a job.
> And, but his past history in trying to hold a job, he just hasn't been successful. And we just – we just didn't understand. And I guess we closed our eyes to it. And so it was a sad situation. But he has just had just – is just – finds

---

[2] The Debtor's attorney asked that the Debtor be allowed to leave the court room when his mother and former sister-in-law testified about his bizarre behavior and personality quirks so that it would not cause "family problems when they got home." When the Debtor departed from the Court room prior to this testimony his demeanor appeared apprehensive and confused.

> it unable to socially – his social graces and things are inept.
>
> . . . .
>
> I wish I could [help him pay back the $136,000 dollars]. I really wish I could. But I'm just a retired teacher and living on a fixed income. I have done a lot to help my grandchildren and family and I just – I wish I could. I'm sorry he's in this situation.

The Debtor's former sister-in-law testified that the Debtor "talks to himself a lot. I mean, just outbursts, you know, of random conversations with himself a lot. When you're out eating, if you go to a restaurant, he'll be just carrying on a full conversation all with himself, you know." She also testified that the Debtor cannot do simple tasks, like operate a microwave.

A letter from the V.A. reveals that the Debtor's disability benefits were increased in January 18, 2005, because the Dysthymic Disorder had worsened. (Plaintiff's Ex. 4.) The Debtor currently lives in the small town of Dover and claims that his employment opportunities are limited. The Debtor does not have a car to drive. His mother testified that it is not in his best interest to drive because he had four wrecks when he first began driving and because of the medication he is currently on. The Debtor testified that he pays the V.A. $60.00 a month for his medication. The type of medication that the Debtor is prescribed was not introduced at trial.

The Debtor spends most of his active hours on his computer, although he has to have help if there is a malfunction.[3] He participates in numerous chat rooms including one that is named Tower of Babel, where he posted a resume in order to obtain volunteer translation work. He also participates in a cite called Global Owl Project which promotes the preservation of endangered species of owls. He did some work on the Tower of Babel web cite as a volunteer translator but when he received criticism from another translator he no longer pursued it. The Debtor admitted

---

[3] The computer was purchased by the Debtor's mother.

that he has not searched for a job since he filed for bankruptcy, stating that "I don't know what job I could do . . . I've failed because I'm very slow as a person. I have been dismissed from a number of jobs because of slow motor responses."

The original loan amount was $67,028.40 with an interest rate of nine percent per annum. (Plaintiff's Ex. 1.) As of March 22, 2006, the total balance due was $136,010.73. (Plaintiff's Ex. 1.) The Debtor has sought different deferments and forbearances on the student loans. The Debtor testified that he inquired about the Income Contingent Repayment Plan (ICRP), but was told that he could not apply because he was in bankruptcy. He acknowledged that under the ICRP plan his payment calculated to zero. No debts were listed on his petition other than the student loan debt. As of the date of the hearing, the Debtor was receiving $712.00 a month in disability benefits as his sole income. (Plaintiff's Ex. 4.) The Debtor has made minimal payments on his student loan balances.

## ARGUMENTS

ECMC's argument is two fold. First ECMC argues that even though the Debtor's income is so low that under the ICRP this Debtor's payments would be zero, he should still be required to pursue this program as an alternative to discharging his student loan debt, whereby at the end of the repayment period, the debt would be forgiven. The second argument is that the Debtor has not made a good faith effort to minimize his expenses and maximize his income.

The Debtor argues that he has made numerous efforts to obtain employment that have all ended in failure and that he is incapable of earning enough to pay any amount on this student loan because of his disability. The Debtor argues that to pay back the student loan would create an undue hardship due to his mental problems; therefore, pursuant to 11 U.S.C. § 523(a)(8) the

loan should be discharged.

## DISCUSSION

A student loan is excepted from discharge unless the debt would "impose an undue hardship on the debtor . . . ." 11 U.S.C. § 523(a)(8)(2000). A debtor seeking discharge of a student loan has the burden of proving by a preponderance of the evidence that the debt will impose an undue hardship. Long v. Educ. Credit Mgmt. Corp. (In re Long), 292 B.R. 635, 638 (B.A.P. 8th Cir. 2003)(citing Woodcock v. Chemical Bank, NYSHESC (In re Woodcock), 45 F.3d 363 (10th Cir. 1995); Andrews v. S.D. Student Loan Assistance Corp. (In re Andrews), 661 F.2d 702, 704 (8th Cir. 1981); Standfuss v. U.S. Dept. of Educ. (In re Standfuss), 245 B.R. 356, 359 (Bankr. E.D.Mo. 2000); Kopf v. U.S. Dept. of Educ. (In re Kopf), 245 B.R. 731, 734 (Bankr. D.Me. 2000) (citing Grogan v. Garner, 498 U.S. 279, 287, 111 S.Ct. 654, 112 L.ED.2d 755 (1991); Clark v. United Student Aid Funds, Inc., 240 B.R. 758, 761 (Bankr. W.D.Mo. 1999))).

Undue hardship is not defined in the Bankruptcy Code. In the Eighth Circuit, in order to determine whether the debtor has suffered an undue hardship, a bankruptcy court must apply the totality of the circumstances test. In re Long, 322 F.3d at 554. Specifically, the court shall consider (1) the debtor's past, present, and reasonably reliable future financial resources; (2) a calculation of the debtor's and dependent's reasonable necessary living expenses; and (3) any other relevant facts and circumstances surrounding each particular bankruptcy case. In re Long, 322 F.3d at 554.

According to the Eighth Circuit, the totality of the circumstances test is simply that "if the debtor's reasonable future financial resources will sufficiently cover payment of the student loan debt while still allowing for a minimal standard of living then the debt should not be

discharged." Reynolds v. Educ. Credit Mgmt. Corp. (In re Reynolds), 425 F.3d 526, 532 (8th Cir. 2005)(quoting Long v. Educ. Credit Mgmt. Corp. (In re Long), 322 F.3d 549, 554-555 (2003)).  This determination will require special consideration of the debtor's future financial prospects.  In re Reynolds, 425 F.3d at 532.  A debtor's health and financial position are in many cases inextricably intertwined; therefore, a debtor's illness is a proper consideration in determining undue hardship.  In re Reynolds, 425 F.3d at 526(citing Andrews v. South Dakota Student Loan Assistance Corp. (In re Andrews), 661 F.2d 702 (8th Cir. 1981)).

## ANALYSIS

The Court first considers the Debtor's past, present, and reasonably reliable future financial resources.  This Debtor has never been able to hold down a job for more than a couple of months.  The Debtor is fifty-four years old and still lives with his mother in a small town with few job prospects.  The Debtor depends on his mother and other members of his family for both financial and emotional support, especially since he does not drive a vehicle.  He requires rides to the V.A. hospital and occasional trips to Russellville and pays $178.00 per month to cover these expenses.

This record is void of any evidence that the Debtor will ever be capable of holding a job. The Debtor testified that he believes part of the reason he was terminated from the jobs he has held was due to his mental diagnosis.  There is no evidence that his mental condition will ever subside; it has persisted since his diagnosis in 1982, twenty-five years ago.   The only reasonably reliable future financial resource that the Debtor has is his disability check from the V.A. for $712.00 a month.  ECMC did not offer the testimony of any witness except the cross-examination of the Debtor.

The Court finds the Debtor's testimony credible as well as the testimony of his mother and former sister-in-law. The Debtor's mother's testimony was particularly compelling. She and her late husband paid for the Debtor to obtain a college degree and attend numerous graduate programs. Their goal was to help him be a productive member of society. ECMC in its brief referred to the Debtor's family as enablers whose actions have encouraged the Debtor to remain unemployed and helpless. The record simply does not support this insensitive characterization. The Debtor's parents paid his educational expenses at Hendrix, the University of Florida, the University of Arkansas, and the University of Central Arkansas. They also paid the Debtor's transportation expenses from the United States to Korea where he attempted and failed to keep a teaching position.

The Debtor's living expenses listed are reasonable and meager. The only expenses that were listed on his Schedule J are the following:

| | |
|---|---|
| Food | $280.00 |
| Clothing | $48.00 |
| Laundry and Dry Cleaning | $37.00 |
| Medical and Dental Expenses | $60.00 |
| Transportation | $178.00 |
| Recreation | $87.00 |
| Total | $690.00 |

(Defendant's Ex. 2.) There was a conflict in the testimony whether the Debtor actually pays for laundry and dry cleaning; however, the amount in controversy is an insignificant amount. The Debtor's annual income is $8,544.00 and this is below the poverty level.[4] The interest that

---

[4] The poverty guidelines updated periodically in the Federal Register by the U.S. Department of Health and Human Services under the authority of 42 U.S.C. 9902(2) show that the poverty level for a one person household is $10,210. 2007 HHS Poverty Guidelines, 72 Fed. Reg. 3147-01 (January 24, 2007).

11

accrues on his debt is more than the Debtor's annual income. Furthermore, the Debtor pays no rent or utilities and when the time comes when his mother is unable to care for him, his financial condition will become even less secure.

ECMC argues that the Debtor should apply for the ICRP. At his current income, ECMC argues that his payments would be zero dollars. However, the availability of the ICRP is "but one factor to be considered in determining undue hardship, but it is not determinative." Lee v. Regions Bank Student Loans (In re Lee), 352 B.R. 91, 95 (B.A.P. 8th Cir. 2006). Even assuming the Debtor is eligible and would pay nothing under the ICRP, there is no point in pursuing the program if the payments would be zero.

The evidence concerning the Debtor's medical disability was limited to reports issued in 1982 and 1986. Neither side presented the testimony of a medical expert. ECMC offered no evidence concerning the Debtor's mental health. The record is silent as to why this critical issue was not more fully developed as it was, for instance, in the case of In re Reynolds, 425 F.2d 526 (8th Cir. 2006). The medical evidence was admitted without objection. The testimony and demeanor of the Debtor as well as the testimony of his two witnesses is enough to convince this Court that the Debtor is truly disabled for the reasons stated in the medical reports. He does not appear to the Court to be a malingerer. All of the evidence stands uncontroverted by ECMC except by argument.

## CONCLUSION

The Debtor has tried to find employment and minimize his expenses by living with his mother; his listed expenses are minuscule expenses; his income is well below the poverty level;

and his future job prospects are bleak because of a diagnosed condition for which there is no apparent cure. The Debtor has failed at every job-related endeavor, except that he did graduate from Hendrix College. Even the Air Force recommended against his re-enlistment. The Debtor's vocational failures are clearly due to the Debtor's mental condition, which is beyond his control. The Debtor's reasonable future financial resources are inadequate to cover payment of the student loan debt while allowing for a minimal standard of living. Therefore, this Court finds that the Debtor's student loan debt shall be discharged.

    IT IS SO ORDERED.

HON. JAMES G. MIXON  
U.S. BANKRUPTCY JUDGE

DATE: 7/09/07

cc:    Henry Means, III, Esq.  
       Kimberly Wood Tucker, Esq.  
       Debtor

EOD 7/9/2007  
by T Wilkins